**UNITED STATES of America,
Appellee,**

v.

**Oliver James AMMONS, Appellant.**

**No. 71–1447.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 12, 1972.

Decided July 19, 1972.

Jerry C. Estes, Fort Dodge, Iowa, for appellant.

Robert L. Sikma, Asst. U. S. Atty., Sioux City, Iowa, Evan L. Hultman, U. S. Atty., for appellee.

Before ROSS and STEPHENSON, Circuit Judges, and DAVIES, Senior District Judge.*

RONALD N. DAVIES, Senior District Judge.

This appeal stems from the conviction of appellant, Oliver James Ammons, on 18 counts of an indictment charging violations of 18 U.S.C. § 2[1] and 18 U.S.C. §

---

* Sitting by special designation.

1. "§ 2. Principals
  "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

  "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

1341, the latter proscribing use of the mail for the purpose of executing a scheme to defraud.

In August, 1967, Charles M. Arnn and Harold Bramlett formed Charles-Harold Enterprises, Inc. (C–H Enterprises), an Iowa corporation, for the purpose of selling central vacuum cleaning systems manufactured by Vacu-Maid, Inc. of Ponca City, Oklahoma. C–H Enterprises opened an office in Fort Dodge and commenced mailing post cards to persons whose names had been selected at random from telephone directories informing them that they had won a free camera. Office girls would then telephone to inquire if the card had been received and when it would be convenient for a company representative to deliver the camera and to explain C–H Enterprises' profit making organization.

When an appointment was made it would be kept by a salesman who introduced himself as representing a control company with funds to be disbursed introducing a new product through "word of mouth" advertising; that selected individuals would be given an opportunity to participate; that the product would be placed in their homes; that persons selected would be able to submit names of other qualified individuals; that if any one of the individuals whose names were submitted consented to participate and were accepted, the person submitting the name would receive $50.00; that the $50.00 commission payment continued through the second level;[2] that only one-fifth of one per cent of the total population of each county could participate; that in a short period of time the product would be paid for; and that selected individuals could have a monthly income for life.

At this point the salesman would reveal that the product was a central vacuum system selling for $899.00 and would have husband and wife sign a purchase order and installation agreement, an "Authorized Sales Representative Agreement and Commission Schedule," a conditional sales contract and a seven day promissory note in the sum of $899.00. The individuals were then told that they would have to be approved by C–H Enterprises' Board of Directors in Florida, after which the vacuum system would be installed and thereafter a public relations man (P–R man) would contact them.

With very few exceptions installation was made the next day and invariably the P–R man would make an appointment within the seven day period contained in the note. The P–R man would again review the sales representative agreement and commission schedule, secure answers to questions contained in a document styled "Public Relations Interview" and then inquire as to whether the individuals desired to pay cash on the promissory note, arrange their own financing or to make payments pursuant to the conditional sales contract.[3]

The foregoing, though modified, is basically what is known as the "chain referral scheme" and has been repeatedly held fraudulent. United States v. Armantrout, 411 F.2d 60 (2nd Cir. 1969), citing United States v. Sterngass, Docket No. 32,704 (2nd Cir. 1968); Blachly v. United States, 380 F.2d 665 (5th Cir. 1967); Nickles v. United States, 381 F. 2d 258 (10th Cir. 1967); Steiger v. United States, 373 F.2d 133 (10th Cir. 1967) rev'd on other grounds; Fabian v. United States, 358 F.2d 187 (8th Cir. 1966).

2. For example, if Mr. A was selected he could recommend Mr. B, Mr. C and Mr. D. If all three elected to participate and were accepted, Mr. A would receive a $50.00 commission for each, a total of $150.00. Then if Mr. B, Mr. C or Mr. D submitted the name of an individual that qualified, Mr. A would receive $50.00, as would the person submitting the name. All persons participating could submit as many names as they wished, but each could not receive commissions beyond the second participant.

3. Not used after appellant became sales manager.

As it is asserted by the appellant that the trial court erred in failing to direct judgment of acquittal or in failing to grant a motion for a new trial because the evidence was insufficient to prove his guilt beyond a reasonable doubt, it is necessary to give a more detailed explanation of the sales methods used after he joined C–H Enterprises, first as a salesman and shortly thereafter as sales manager.

In passing on the sufficiency of the evidence, an appellate court will not weigh conflicting evidence nor consider the credibility of witnesses and must view the evidence and the reasonable inferences that may be drawn therefrom in the light most favorable to the prosecution and determine as a question of law whether there is substantial evidence, either direct or circumstantial, to support the verdict. United States v. Jacobs, 451 F.2d 530, (5th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231; Fabian v. United States, *supra*. See United States v. Mahanna, 461 F.2d 1110 (8th Cir. 1972); United States v. Briddle, 430 F.2d 1335 (8th Cir. 1970); Friedman v. United States, 347 F.2d 697 (8th Cir. 1965).

When appellant was employed in March of 1968 C–H Enterprises was concentrating almost exclusively on names submitted by prior purchasers. A prospect would be phoned by an office girl who gave a fictitious name[4] and asked if the prospect knew Mr. . . . . . . . . . . (the party who had submitted his name). Upon receiving an affirmative response, the prospect would be told that a sum of money had been assigned to him and his wife through Mr. . . . . . . . . . . . and that a salesman would call upon them to explain the money-making program. If the prospects sought further information the office girl informed them that she was not qualified to answer but that the salesman would explain in detail. If the prospects persist-

ed the girl would say that the money would be given to charity and then terminate the conversation.

Upon arriving at prospects' homes in response to appointments the salesman used a memorized presentation prepared by the appellant. The presentation lasted two to three hours and was designed to leave the impression that if the prospects joined the program and were accepted the vacuum system installed in their homes could be paid for through referral commissions and there could be earnings of up to $500.00 per month for life. Of the time used in making the presentation the greater portion was devoted to describing the referral program and commission schedule and it was only at the end that prospects were told that the product involved was a central vacuum system.

Though all purchasers signed the seven day promissory note and knew that it would have to be paid, they believed that payment could be made as commissions were earned. When questioned about whether the note was necessary the salesmen were instructed to say it was only to cover the material and installation charges until the P–R man arrived.

When the P–R man arrived he would first review the referral program and commission schedule and then complete a "Public Relations Interview" containing questions designed to elicit answers showing the purchasers understood the referral program, were satisfied with the vacuum system and that the salesman had made no promises or representations not contained in the "Authorized Sales Representative Agreement and Commission Schedule." He then picked up forms that had been completed by the purchasers containing names of people they felt qualified, they having previously been told that it was possible that 51% of the people listed would participate.

The seven day note was then presented for payment and the purchasers told

4. When making phone calls the office girls were instructed not to use their real names nor to reveal the name of C–H enterprises.

they could either pay cash or arrange financing. If the purchasers protested and claimed that the salesman had said that payment could be made through earned commissions, they were told that they had misunderstood the program and that C–H Enterprises would not begin contacting any referrals until the note had been paid. In most instances payment was then made or financing arranged. While several of the purchasers received referral commissions in excess of the $899.00 paid for the vacuum, most received few, if any. Those who received the greater number of commissions were used as examples to others during sales presentations.

"The basic elements of a violation of the Mail Fraud Statutes are (1) a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States Mails to further the scheme. (Citations omitted.) We have said that a scheme to defraud under the statute is one in which it is 'reasonably calculated to deceive persons of ordinary prudence and comprehension.' (Citation omitted.) Willful intent may be inferred from the statements and activities of the parties to the scheme." United States v. Seasholtz, 435 F.2d 4 (10th Cir. 1970).

■ The evidence, from which the jury could, and did, find that appellant participated in a scheme to defraud and from which they could, and did, infer existence of fraudulent intent was abundant to sustain the verdict.

Considered next is appellant's contention that it was error not to give his proffered instruction on good faith being a complete defense to the charges contained in the indictment and the failure of the trial court to set forth the factors upon which the appellant relied.

The trial court charged that:

"Fraudulent intent is one of the essential elements of the offenses with which the defendants are charged. Fraudulent intent is not presumed or assumed; it is personal and not imputed. One is chargeable with his own personal intent, not the intent of some other person. Bad faith is an essential element of fraudulent intent. Good faith constitutes a complete defense to one charged with an offense of which fraudulent intent is an essential element. One who acts with honest intention is not chargeable with fraudulent intent. One who expresses an opinion honestly held by him, or a belief honestly entertained by him, is not chargeable with fraudulent intent even though such opinion is erroneous and such belief is a mistaken belief. Evidence which establishes only that a person made a mistake in judgment or an error in management, or was careless, does not establish fraudulent intent. In order to establish fraudulent intent on the part of a person, it must be established that such person knowingly and intentionally attempted to deceive another. One who knowingly and intentionally deceives another is chargeable with fraudulent intent notwithstanding the manner and form in which the deception was attempted."

■ While this instruction could have been enlarged to incorporate the specific factors upon which the appellant relied to show he acted in good faith, jury instructions must be considered in their entirety and the instructions here taken as a whole fully expressed the legal principles applicable to the defense. United States v. Bessesen, 445 F.2d 463 (7th Cir. 1971), cert. denied, 404 U.S. 984, 92 S.Ct. 448, 30 L.Ed.2d 368; Tarvestad v. United States, 418 F.2d 1043 (8th Cir. 1969), cert. denied, 397 U.S. 935, 90 S. Ct. 944, 25 L.Ed.2d 116. The jury need not be instructed on every inference that it might draw bearing on the issue of good faith.

■ Prior to trial the appellant twice moved for production of the Grand Jury minutes, which motions were denied by the trial court for failure to establish a particularized need and because it was only conjecture that the minutes might

reveal grounds for motions to dismiss. A transcript of each witness' testimony before the Grand Jury was presented during trial prior to the witnesses testifying.

"This ruling is in accord with the rule well established in this circuit. See National Dairy Products Corp. v. United States, 384 F.2d 457 (8 Cir. 1967); Hanger v. United States, 398 F.2d 91 (8 Cir. 1968); United States v. Davis, 410 F.2d 959 (8 Cir. 1969). Considering the facts presented in the light of the principles enunciated in the National Dairy and Hanger cases, we find no error here." United States v. Cole, 449 F.2d 194 (8th Cir. 1971), cert. denied, 405 U.S. 931, 92 S.Ct. 991, 30 L.Ed.2d 806.

The appellant raises numerous other issues in seeking reversal and, while all have been considered, because of their insubstantiality discussion thereof is pretermitted.

Affirmed.