763 F.2d 312
 18 Fed. R. Evid. Serv. 730
 UNITED STATES of America, Appellee,
v.
AMERICAN GRAIN & RELATED INDUSTRIES, Appellant.
UNITED STATES of America, Appellee,
v.
R.P. KEVLIN, Appellant.
UNITED STATES of America, Appellee,
v.
Jack M. WYARD, Appellant.
UNITED STATES of America, Appellee,
v.
Tom WILLIAMSON, Appellant.
 Nos. 83-2587 to 83-2590.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 14, 1984.
Decided May 23, 1985.
As Modified on Denial of Rehearing July 24, 1985.
 
 Thomas Mulroy; Mark Pennington, Theodore Duffield and Raymond Rosenberg, Des Moines, Iowa, for appellant.
 John Bannon, for appellee.
 Before HEANEY and FAGG, Circuit Judges, and COLLINSON*, Senior District Judge.
 FAGG, Circuit Judge.
 
 
 1
 American Grain & Related Industries (AGRI) and several of its employees appeal from convictions on a one count indictment for criminal conspiracy to remove, dispose of, and convert grain owned by or pledged to the Commodity Credit Corporation (CCC), an agency of the federal government, in violation of 15 U.S.C. Sec. 714m(d). The potential conspirators involved are limited by dismissal and acquittal of three employees at trial to indicted and convicted defendants AGRI, R.P. Kevlin, Jack Wyard, and Tom Williamson, and unindicted AGRI employees B.J. O'Dowd and Joe Lee Duncan. Among numerous grounds of attack, all defendants claim that the United States failed to present sufficient evidence to sustain their convictions. After a careful review of the record, we hold that the United States failed to present sufficient evidence to support Kevlin's conviction for conspiracy, and consequently we reverse his conviction. We are also compelled to reverse the convictions of AGRI, Wyard, and Williamson and remand their cases to the district court for a new trial because of the jury's exposure to and consideration of certain prejudicial hearsay evidence.
 
 
 2
 The essence of a conspiracy is an agreement to commit an illegal act. Ianelli v. United States, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975); United States v. Snider, 720 F.2d 985, 988 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984). The agreement need not be formal or express, and it may be no more than a tacit understanding among the participants. See United States v. Mohr, 728 F.2d 1132, 1135 (8th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 148, 83 L.Ed.2d 87 (1984). Circumstantial evidence, especially evidence of concerted activity directed toward achievement of a common goal, is as probative as direct evidence. United States v. Michaels, 726 F.2d 1307, 1311 (8th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984); United States v. Richmond, 700 F.2d 1183, 1190 (8th Cir.1983).
 
 
 3
 To prove that an individual is a member of a conspiracy, the United States must prove that the particular individual knowingly contributed his or her efforts in furtherance of the objective of the conspiracy. Michaels, 726 F.2d at 1311; United States v. Burchinal, 657 F.2d 985, 990 (8th Cir.), cert. denied, 454 U.S. 1086, 102 S.Ct. 646, 70 L.Ed.2d 622 (1981). Mere knowledge of an illegal act or association with an individual engaged in illegal conduct is not enough. Richmond, 700 F.2d at 1190. The United States must demonstrate, with respect to each individual defendant, " 'some element of affirmative cooperation or at least an agreement to cooperate' in the object of the conspiracy." Id. (quoting United States v. Brown, 584 F.2d 252, 262 (8th Cir.1978), cert. denied, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979)).
 
 
 4
 The United States has taken the position that this case involves a conspiracy to ship CCC grain stored at Fort Worth for AGRI's use in Houston and to conceal the shortage at Fort Worth by the purchase of replacement grain. In light of our primary role in reviewing the sufficiency of evidence offered to support a criminal conviction, Hamling v. United States, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974), we have studied the testimony and exhibits with great care. In doing so, we view the evidence in the light most favorable to the jury's verdict, accepting all reasonable inferences tending to support that verdict. United States v. Sopczak, 742 F.2d 1119, 1121 (8th Cir.1984).
 
 
 5
 The record reveals the following facts. AGRI, headquartered in Des Moines, Iowa, is a farmer-owned cooperative primarily engaged in the merchandising and storage of grain. AGRI owns several grain storage facilities, including one in Fort Worth, Texas, and one in Houston, Texas. Each AGRI facility is licensed by the federal government. A federal license requires its holder to keep sufficient grain on hand to meet the obligations of the licensed facility. AGRI does a considerable amount of business storing grain for the CCC.
 
 
 6
 On the evening of May 4, 1983, a blending error occurred while loading a freighter at AGRI's Houston facility. As a result, the Houston facility no longer had a sufficient quantity of high quality wheat to finish loading the freighter and AGRI faced contract penalties for any delay in loading the wheat. Upon learning of the situation on the morning of May 5, 1983, Jack Wyard, AGRI vice president in charge of wheat and milo purchases and sales, decided to move wheat from AGRI's Fort Worth facility to the Houston loading dock. Wyard ordered Joe Lee Duncan, whose job is to arrange transportation for grain other AGRI employees buy and sell, to ship 87,000 bushels of wheat from Fort Worth to Houston. Duncan protested that AGRI had insufficient wheat at Fort Worth to cover its other obligations and refused to carry out Wyard's order. Wyard insisted that AGRI had plenty of wheat. Still reluctant, Duncan insisted they obtain authorization for the shipment from Duncan's boss, Tom Williamson, AGRI's vice president in charge of transportation.
 
 
 7
 Duncan informed Williamson that he did not believe AGRI had "enough ownership at Fort Worth to fill [Wyard's] request." Wyard, on the other hand, stated that AGRI had plenty of wheat in Texas, that he had everything covered, and that he would take full responsibility for the decision. Williamson did not make an immediate decision but rather stated that he would discuss the matter with executives across the hall. Among others, B.J. O'Dowd and Kevlin have offices across the hall from Williamson.
 
 
 8
 Upon finding these executives away from their offices, Williamson told Duncan to load the wheat in railroad cars. At that time, however, Williamson did not give Duncan permission to allow the cars to be removed from AGRI's Fort Worth facility. Wyard prepared a rail shipping request for the 87,000 bushels of wheat. Later in the day, Duncan prepared and Wyard signed a second rail shipping request for 49,500 bushels of wheat to cover wheat in the first request that failed grade inspection. Duncan had the railroad cars loaded in conformity with Williamson's orders. Under authority of the two shipping requests signed by Wyard, the railroad picked up one trainload of wheat on the afternoon of May 5 and a second trainload on the morning of May 6.
 
 
 9
 Wyard and Williamson claim that the evidence is insufficient to allow a rational jury to conclude that they conspired to convert CCC grain. We have previously held that
 
 
 10
 [t]o convict a defendant of criminal conspiracy, the government is obligated to prove that "the individual entered an agreement with at least one other person, that the agreement had as its objective a violation of the law, and that one of those in agreement committed an act in furtherance of the objective."
 
 
 11
 Michaels, 726 F.2d at 1310-11 (quoting United States v. Evans, 697 F.2d 240, 244-45 (8th Cir.), cert. denied, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983)). Wyard contends that he lacked the criminal intent required to prove the charge of conspiracy to convert because he ordered the shipment based on an honestly mistaken interpretation of AGRI's grain storage licenses. Williamson contends that regardless of Wyard's intent, the shipments were accomplished without Williamson's authorization and thus he did not agree to accomplish a common criminal objective with Wyard. In support of his position, Williamson contends that his last participation in the events of May 5 was to order the cars loaded but held in Fort Worth.
 
 
 12
 We conclude that a rational jury could find that Wyard and Williamson were aware, from their experience in the grain industry and the protests of Duncan on May 5, that the grain at Fort Worth belonged to the CCC. The evidence also supports the jury's rejection of Williamson's claim that he did not authorize the shipments. Duncan testified that he shipped the wheat because he "knew Jack [Wyard] had approval." There is no evidence that Wyard sought anyone's approval but Williamson's. Duncan also testified several times that he would not cooperate in the shipment without Williamson's authorization, and Duncan did cooperate in the shipment. Finally, Duncan testified that he eventually cooperated in the shipment of grain that he knew AGRI did not own because he "was under orders to do it by [his] boss and superior." The jury could rationally conclude that in referring to his boss and superior, Duncan was referring to Williamson. On the basis of all the evidence, a rational jury could legitimately conclude that Wyard and Williamson discussed the shipment, that they knew the grain belonged to CCC and not AGRI, and that together they prevailed over Duncan's reluctance to ship the grain to Houston. These actions suffice to demonstrate the affirmative cooperation necessary to support a conviction for conspiracy. See Richmond, 700 F.2d at 1190.
 
 
 13
 We do not believe the evidence supports a similar conclusion with respect to Kevlin. Initially, the United States claims that Kevlin and B.J. O'Dowd, the president of AGRI, joined the conspiracy to ship grain on May 5. The independent evidence shows, however, that Kevlin, executive vice president in charge of administration, first learned of the shipment at 4:30 p.m. on May 5 by telephone at his home. O'Dowd was notified of the shipment at 6:30 p.m. in AGRI's parking lot in Des Moines. Kevlin and O'Dowd were told only that the grain had been shipped. They were not told that two separate trains had been loaded, that the shipments could be stopped, or any other details of the day's events in Texas and Iowa.
 
 
 14
 The district court ruled that O'Dowd did not become a conspirator simply because he heard about the shipment on the evening of May 5. We agree, and we reach the same conclusion with respect to Kevlin. Mere knowledge that a crime may have been committed is insufficient to connect one to a conspiracy. Richmond, 700 F.2d at 1190. There is no independent evidence to suggest that Kevlin or O'Dowd joined in the conspiracy to ship grain on May 5.
 
 
 15
 The United States also maintains that Kevlin and O'Dowd became members of the conspiracy by attempting to cover up the shipments by purchase of replacement grain. We conclude that there is no evidence that any AGRI employee, either by himself or in combination with another, attempted or planned to cover up the shipments to Houston.
 
 
 16
 On the morning of May 6, Wyard discussed the shipments with Kevlin. The only evidence of Kevlin's knowledge of the details of the shipments on May 5 or 6 shows that Kevlin was told the shipments were a past event which could no longer be changed. Kevlin told Wyard the shipments were wrong because they violated the conditions of the Fort Worth license. The two then discussed what corrective action should be taken. Kevlin ordered Wyard to record the shipments accurately in AGRI's books and to procure suitable wheat to replace that shipped from Fort Worth. Wyard represented to Kevlin that he would replace the grain within a week.
 
 
 17
 The evidence of any action or involvement by corporate officers between May 6 and May 13 is sparse. O'Dowd left town for the weekend after hearing of the shipment on the evening of May 5, and his exact date of return is not established. Wyard was also out of town on Tuesday and Wednesday, May 10 and 11, and part of Thursday, May 12, leaving replacement of the grain in the hands of his assistants. Upon returning to the office on May 12, Wyard discovered that his assistants had procured only 1000 bushels of wheat through routine purchasing efforts.
 
 
 18
 On May 13 AGRI executives and AGRI's corporate counsel met to formulate a corporate response to the shipments of May 5 and 6. At the May 13 meeting, Kevlin's order to Wyard to record the shipments accurately was not countermanded. Upon hearing of Wyard's failure to purchase replacement grain in the preceding week, O'Dowd ordered immediate replacement of the grain, regardless of its cost. O'Dowd also decided, in response to the advice of AGRI's corporate counsel, not to notify the federal government "at this time." On May 16, AGRI's board of directors met and altered only one aspect of the May 13 decision: the board decided to notify the federal government of the May 5 and 6 shipments and Kevlin carried out that order.
 
 
 19
 The United States initially asks us to draw an inference of wrongdoing from AGRI's failure to report the May 5 and 6 shipments for eleven days. See 7 C.F.R. Sec. 102.98. We are not inclined to do so. No one disputes that AGRI's books at all times reflected the shipments to Houston and the shortage at Fort Worth or that the books were available for inspection. Further, there is no evidence that countermanding Kevlin's orders to Wyard on May 6 to record the shipments accurately and replace the grain was ever suggested. We also observe that various AGRI executives were scattered until the meeting on May 13. As previously indicated, O'Dowd decided at that May 13 meeting, upon the advice of corporate counsel, not to notify the federal government. However, this decision was promptly countermanded at a directors' meeting on May 16 and AGRI made a full disclosure of the shortage. Under these circumstances, there is no support for the inference of wrongdoing sought by the government.
 
 
 20
 The United States also claims that AGRI's efforts to replace the grain are evidence of a conspiracy to cover up the shipments. We cannot agree. AGRI's executives had a duty to correct the shortage caused by the shipment of grain from Fort Worth. From the first executive decision made by Kevlin on May 6, AGRI pursued that correction. The United States' contention ignores the reality that replacement of the grain does nothing to hide the incriminating entries on AGRI's books recording the May 5 and 6 shipments. Taking steps to replace the grain that was shipped to Houston does not make the executives involved in corrective action coconspirators with the executives whose acts accomplished the shipments.
 
 
 21
 The United States thus failed to prove that Kevlin or O'Dowd were involved in the conspiracy. Although the evidence against Wyard and Williamson is sufficient to send their cases to the jury, we conclude that their convictions are impermissibly tainted by the jury's exposure to and consideration of inadmissible hearsay evidence. Much of the United States' case was built on the testimony of Tom Duffy, AGRI's vice president in charge of planning. Duffy discovered the grain shortage at Fort Worth on May 11 when he returned to AGRI's headquarters after a business trip. He testified at trial to statements made by other AGRI employees on May 12 and 13 concerning the shipments of grain to Houston.
 
 
 22
 The admissibility of the out-of-court declarations related to the jury by Duffy hinges on the United States' ability to prove by a preponderance of the independent evidence that the person speaking to Duffy was a member of the conspiracy and that the statements were made during the course and in furtherance of the conspiracy. United States v. Bentley, 706 F.2d 1498, 1506 (8th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984); United States v. Bell, 573 F.2d 1040, 1043-44 (8th Cir.1978). At the close of all the evidence, the district court ruled on the admissibility of each conversation related by Duffy, excluding from the jury's consideration some of the out-of-court declarations and permitting the jury to consider others. AGRI, Wyard, and Williamson contend that some of the statements conditionally admitted under Bell were so prejudicial that the district court's cautionary instruction to the jury to disregard the statements would not suffice to cure the prejudice. The defendants further contend that other statements ultimately ruled admissible by the district court under Bell should have been excluded. We agree with the defendants' contentions respecting two of the statements related by Duffy and believe AGRI, Wyard, and Williamson suffered prejudice necessitating the reversal of their convictions.
 
 
 23
 The statements which concern us include, first, statements by Ed Graham, AGRI's corporate counsel, to Duffy on May 13. According to Duffy, Graham reported at the May 13 executive session, after an investigation of the May 5-6 activities, that a "serious federal violation occurred." Thus, in the face of Wyard's defense that the shipments were an honest mistake and Williamson's defense that he had not participated in the shipments at all, the jury had before it AGRI's own attorney's opinion that AGRI personnel had participated in criminal activity. We agree with the district court's ruling that the United States failed to produce any evidence to show that Graham was a coconspirator. We do not agree, however, that the district court's abbreviated cautionary instruction to disregard the statement could restore fairness and cure the prejudice caused by Duffy's testimony relating Graham's conclusion that high-level AGRI executives had committed a violation of federal law. The prosecution risks mistrial under the Bell procedures if it finds itself unable to connect conditionally admitted statements to the conspiracy. United States v. Offutt, 736 F.2d 1199, 1200 (8th Cir.1984). Since the United States failed to demonstrate Graham's participation in a conspiracy and the statements of Graham, as related by Duffy, were too prejudicial to be cured by a cautionary instruction, we are compelled to reverse the convictions of AGRI, Wyard, and Williamson and grant them a new trial.
 
 
 24
 Second, we find reversible error in the district court's ruling that B.J. O'Dowd was a member of the conspiracy and that O'Dowd's statements to Duffy on May 13 were thus admissible as declarations of a coconspirator under Federal Rule of Evidence 801(d)(2)(E). While it was proper for the district court to admit the statements conditionally with the expectation that the government would connect O'Dowd to the conspiracy, the government failed to make the necessary connection. As we earlier stated, the United States presented no evidence to show that O'Dowd was involved in the decision to ship grain or that there was any attempt or plan to cover up the shipment. The district court's determination that O'Dowd was a coconspirator is thus clearly erroneous, Anderson v. City of Bessemer, --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); United States v. Singer, 732 F.2d 631, 636 (8th Cir.1984), and admission of the statements was error.
 
 
 25
 Duffy testified that O'Dowd expressed the opinion that the shipments to Houston were illegal. He also stated that use of other people's grain was a routine practice in the industry. Like Graham's comments, O'Dowd's hearsay statements are critically damaging to Wyard's testimony that the shipment was an isolated and unintentional error and to Williamson's insistence that he was not involved. Viewing this as a close case, we cannot say that admission of O'Dowd's statements was harmless error. See Wright v. United States, 389 F.2d 996, 1000 (8th Cir.1968). Even if the district court would have ultimately excluded the testimony and instructed the jury to disregard it, we believe the jury's exposure to the testimony too prejudicial to avoid reversal. This case underscores the importance of the government having the ability to connect the declarant to the conspiracy when introducing a statement at trial under Federal Rule of Evidence 801(d)(2)(E). See United States v. Macklin, 573 F.2d 1046, 1049 n. 3 (8th Cir.1978).
 
 
 26
 The parties present several other contentions that should be discussed for the benefit of retrial. First, the defendants claim that the indictment should be dismissed because of a personal interest by the prosecutor in facilitating the attempt by certain individuals to take control of AGRI. According to the defendants, the United States Attorney abused his discretion in bringing this case before the grand jury. After holding an evidentiary hearing on the issue, the district court ruled that there was no evidence that the United States Attorney was "motivated by any purpose other than to serve properly the responsibilities of his office." We have carefully reviewed the record and agree with the ruling of the district court.
 
 
 27
 Second, AGRI claims that a corporation can never be held liable for a conspiracy solely among its own employees. Although we have no occasion to delineate the precise scope of a corporation's liability for conspiracies among its employees, we reject AGRI's general contention. We join the First, Sixth, and Eleventh Circuits in recognizing that a corporation can be convicted of criminal conspiracy for the acts of two or more of its agents "conspiring together on behalf of the corporation." United States v. Peters, 732 F.2d 1004, 1007-08 (1st Cir.1984); see United States v. S & Vee Cartage Co., 704 F.2d 914, 920 (6th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983); United States v. Hartley, 678 F.2d 961, 970-72 (11th Cir.1982), cert. denied, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). We believe that conspiracy convictions, on retrial, of Wyard and Williamson, as vice presidents of the company, would also permit the conviction of AGRI for criminal conspiracy.
 
 
 28
 Third, defendants object to two of the instructions read to the jury. It is claimed that jury instruction No. 1 directs the jury to find that the overt acts described in the indictment were indeed committed by the defendants. We cannot agree. Instruction No. 1 merely describes the contents of the indictment and notes that all defendants pled not guilty. Read as a whole, United States v. Hutchings, 751 F.2d 230, 239 (8th Cir.1984), the instructions adequately apprised the jury of its duty to reach a verdict of not guilty unless the evidence shows beyond a reasonable doubt that the defendants committed each element of the offense charged, including at least one of the overt acts specified in the indictment.
 
 
 29
 Instruction No. 19 informed the jury that intent to replace the grain is not a defense to a willful conversion. Contrary to the contention of defendants, we believe that instruction 19 is a proper statement of the law. We do believe that the jury also should have been instructed that efforts to replace the grain are relevant to whether appellants had the intent necessary to commit a willful conversion of CCC grain at the time it was shipped to Houston. On retrial, we suggest that upon the defendants' request, the court give such an instruction.
 
 
 30
 Finally, defendants contend that prejudicial questioning by the United States Attorney necessitates a reversal of this case. The defendants point to the prosecutor's insinuation to the jury that AGRI fired the employee who committed the blending error in Houston because of his race. Although we find the prosecutor's insinuation most disturbing, especially in light of the discharged employee's testimony that race had nothing to do with his discharge, we believe that the curative acts taken by the district court were adequate, and we have no question that the problem will not recur on retrial. The defendants also point to the prosecutor's questions respecting Wyard's salary and benefits as an improper appeal to class bias. Although we do not view the prosecutor's questions as particularly relevant, we do not agree that the questions amount to an improper appeal to class bias. In light of our conclusion that the evidence supports Williamson's participation in the conspiracy to ship CCC grain, the defendants' contention that the jury was subjected to improper questioning and argument respecting Williamson's involvement in the shipment is without merit.
 
 
 31
 In conclusion, we hold that the United States failed to present evidence sufficient to connect Kevlin to a conspiracy, and consequently we reverse his conviction. We further hold that the jury's exposure to and consideration of prejudicial evidence compels reversal of the convictions of AGRI, Wyard, and Williamson and thus we remand their case to the district court for a new trial.
 
 
 
 *
 The Honorable William R. Collinson, Senior United States District Judge for the Western District of Missouri, sitting by designation