UNITED STATES, Appellee,

v.

Jack CASPERSON, Appellant.

UNITED STATES, Appellee,

v.

Bernard Philip PLETCHER, Appellant.

UNITED STATES, Appellee,

v.

Ronald A. SABLOSKY, Appellant.

UNITED STATES, Appellee,

v.

Gerald RUIS, Appellant.

Nos. 84–2085, 84–2097, 84–2098 and 84–2145.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1985.
Decided Sept. 17, 1985.

Richard Braithwaite, Raymond Rosenberg & Patrick J. Kane, Sioux Falls, S.D., for appellants.

David L. Zuercher and Robert A. Mandel, Pierre, S.D., for appellee.

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, and ARNOLD, Circuit Judge.

BRIGHT, Senior Circuit Judge.

Jack Casperson, Bernard Philip Pletcher, Ronald A. Sablosky, and Gerald Ruis appeal from their convictions for violations of 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), 1343 (wire fraud), and 2314 (inducing interstate travel to defraud). For reversal, appellants challenge the district court's failure to give a "good faith" or theory of defense instruction. In addition, Ruis challenges the sufficiency of the evidence supporting his conviction; Casperson, Pletcher, and Ruis claim that the doctrine of merger bars their conviction on both the substantive counts and the conspiracy count; and Sablosky contends that the trial judge erred in denying his request for a continuance. For the reasons discussed below, we reverse Ruis' conviction, and remand to the district court with instructions to enter a judgment of acquittal. The convictions of Casperson, Pletcher, and Sablosky are also reversed and remanded for a new trial.

## I. BACKGROUND.

This case involves a loan scheme in which investors were induced to pay an advance fee in order to obtain long-term, low-interest loans which they never received. Although appellants' accounts of the scheme vary with respect to some details, the central issue in this case concerns not the factual sequence of events, but whether appellants had the requisite intent to defraud.

In late 1981, Phil Pletcher went to Florida in an effort to raise money to finance the construction of an ethanol plant in Iowa. While there, he met Jack Casperson, who was seeking financing for a fish preservation process he hoped to distribute. When neither man was successful in obtaining loan money in Florida, Casperson

suggested they go to California and meet with Norman Bernard Thirion, who was reputed to be an international financier with access to foreign funds.

Casperson and Pletcher first met with Norman Thirion in Newport Beach, California, in January 1982. They describe Thirion—as do other witnesses who met him—as a charming and impressive man whose office and home were very lavish and whose credentials as a financier seemed equally impressive. Thirion referred to his experience and connections in international finance in both the European and Arabian money markets, and claimed to have been a financial emissary for Howard Hughes' Suma Corporation. He professed to be a close friend of the royal family of Saudi Arabia, and produced photographs of himself with various members of the royal family. He also displayed pictures of himself with President Anwar Sadat of Egypt and with Adnan Khashoggi, one of the richest men in the world. Thirion indicated that he had access to large sums of money available from a $2 billion trust of Arab oil money. In short, he projected an aura of great personal wealth, international banking experience at the highest level, and the ability to obtain international financing in substantial amounts.

At the initial meeting in January 1982, Thirion informed Pletcher, Casperson, and several other persons who were also seeking loans, that he was involved in a project which would make vast sums of Arab oil money available. He told the group that he could secure a block loan of $250 million for them at a low rate of interest, subject to certain conditions. Thirion indicated that he would require an advance fee or "loan contingency fund" of $250,000 (that figure was later reduced to $160,000) to cover the costs and expenses of obtaining the loan. Although various features of the loan have been explained differently, the borrowers apparently were to receive 96% of the loan, approximately $200 million of which was to be invested in "deep-discount" securities which would be used to pay back the interest and principal on the entire $250 million. The amount remaining would be available to the borrowers to be used for their individual projects.

Thirion invited Pletcher, Casperson and the others to check his bank references, which included the Canadian Permanent Trust Bank, where Thirion said he maintained a trust account for the receipt of overseas funds, and a Mr. Ernest Roark, who, according to Thirion, was vice president of the Bank of America. Pletcher called the Canadian bank and confirmed that Thirion maintained a trust account there. He also called Ernest Roark at Bank of America, who gave a favorable account of Thirion's financial activities.[1] Several others present at the January meeting decided to opt out of the transaction after being told that Thirion would not place the advance money in escrow, and after receiving unfavorable information when they checked on Thirion's background. However, Pletcher and Casperson decided to pursue the loan.

In February 1982, Pletcher and Casperson formed a corporation, International Financial Services Group (IFSG), through which they entered into a written agreement with Thirion, acting on behalf of his company, International Banking Services (IBS), for a $250 million, twenty-year loan to be made upon receipt of $160,000.[2] Because Pletcher and Casperson could not come up with that amount themselves, they decided to make a portion of the loan money available to other investors who were also looking for loans and who could afford to put up the money necessary to cover the loan contingency fee. To this end, they held a series of meetings with potential investors in February, March, and April of

---

1. It later developed that Roark was really only an assistant in operations for a Bank of America branch in San Diego, not vice president. Roark was named as an unindicted co-conspirator.

2. A third person, Gregory Meyers, also participated in the loan transaction and in the formation of IFSG. Meyers pled guilty pursuant to a plea agreement and testified at trial as a Government witness.

1982 in Iowa, Minnesota, South Dakota, and California. Those who attended the meetings were told that the $250 million available to IFSG through Thirion was greater than needed; that the excess was being made available to others to enable IFSG to raise a required $160,000 advance fee; that an advance fee of $20,000 was required for every $1 million the investor wished to borrow; that the advance fee would be returned when the loan was obtained (generally in six to eight weeks); and that investors were to pay 10¾% interest, which was 1% more than IFSG was paying for the money and considerably less than the prime rate then being charged by commercial lenders. Investors were also told that the return of their advance fees would be guaranteed by commissions and proceeds from a separate venture involving the sale of large quantities of Mexican tuna fish.[3]

Appellant Gerald Ruis was employed by IFSG in March of 1982. He performed certain clerical duties for the corporation, attended several of the meetings IFSG held for potential investors, and explained the loan program to one prospective investor and his wife at a meeting in Adrian, Minnesota.

By April of 1982, investors had paid more than $400,000 in advance fees, an amount considerably in excess of the $160,000 IFSG supposedly needed to obtain the loan. Although the original time for completion of the loan was supposed to be the end of April, that date passed and Thirion produced no loan money and returned none of the advance fees. Months went by without results, but Thirion always managed to come up with some plausible excuse for the delay. Casperson, Pletcher, Thirion, and attorney Ronald Sablosky, who was vice president and corporate counsel for IBS, conveyed these excuses to investors, explaining, among other things, that the delay was due to the Iran-Iraq war, problems caused by the Ayotollah Khomeni or the Palestinians, Israeli invasions of one country or another, Moslem religious holidays, and the royal wedding in England. In addition to these and other excuses, investors received various documents sent in an effort to reassure them that their advance fees were not at risk. These included documents about the Mexican tuna transaction, the proceeds of which were supposedly intended to secure the advance fees, a promissory note to each investor from Casperson, and a June 1982 letter from Thirion to the investors explaining that IBS was fully guaranteeing Casperson's promissory notes to protect their advance fees. In addition, Sablosky wrote to investors stating that he held securities sufficient to cover the IBS guarantee in his attorney trust account.

On September 14, just before the notes issued by Casperson and guaranteed by Thirion's company, IBS, came due, Sablosky wrote the investors again explaining that, because of unstable conditions in the Mid-East, Thirion had not yet obtained the loans although he was still "working on it." Sablosky advised the investors that they

---

**3.** In late January 1982, before Thirion made the loan commitment, he told Casperson that he had been asked to market a very large quantity of Mexican canned tuna. Casperson introduced Thirion to a seafood broker, John MacCauley, who agreed to market the tuna. As a finder's fee, Casperson was promised a commission (variously described as five or ten cents a case) to be paid when the tuna was sold. In February, MacCauley obtained telexes from two seafood companies stating that each had sold 1.8 million cases of the tuna subject to favorable laboratory testing. MacCauley also produced what appeared to be a positive laboratory report on the tuna.

Casperson agreed to assign the commissions he would receive from the tuna sales as security for the funds advanced by investors. MacCauley also agreed to assign a portion of the profit his company was to receive from the tuna sales to guarantee the return of the funds advanced. However, it was later revealed that the tuna did not exist in the quantities Thirion had represented, and that, in any event, MacCauley may not have had the right to market it. Moreover, the telexes MacCauley procured contained false statements about the tuna sales, and the "positive" laboratory report he produced had been edited to remove negative references to the quality of the tuna. In reality, no tuna sales were ever consummated, and therefore no sales commissions or proceeds were generated to secure the advance fees paid by the investors.

could cancel their loan request and IBS would refund 90% of their advance fee (the remaining 10% was to be returned at a later time if possible). He attached a form for obtaining a refund, and IBS repaid several investors who returned the form during the month of October. However, other investors who requested a refund in November were not paid because, according to Sablosky, no money remained in company accounts. In all, IBS refunded less than $100,000.

Thirion left the United States in late fall of 1982 and did not return.[4] It became apparent that no loans were forthcoming, that Casperson's guarantees were based on commissions and proceeds from a Mexican canned tuna transaction that never took place, and that the securities Sablosky purportedly held in trust to cover IBS' guarantee of Casperson's promissory notes were worthless.

In December 1983, a federal grand jury indicted appellants, charging them with conspiracy, mail fraud, wire fraud, and inducing interstate travel to defraud.[5] Following a lengthy jury trial in May and June of 1984, all four appellants were found guilty on various counts of the indictment. This appeal followed.

## II. DISCUSSION.

### A. Sufficiency of the Evidence Against Ruis.

Gerald Ruis contends that the evidence was insufficient to support his conviction and, therefore, the district court erred in denying his motions for judgment of acquittal.[6]

The record discloses that Ruis and Pletcher, who were friends and fellow church members, began in mid-1981 to explore the possibility of building an ethanol plant in Iowa. They concluded that the project was feasible, and while Pletcher went to Florida to seek financing, Ruis continued to do research on ethanol plants and production. When Pletcher did not succeed in obtaining a loan in Florida, Ruis, who was unemployed, went to work for Radio Shack as a salesman.

After Pletcher returned from California in February 1982, he told Ruis about Thirion's $250 million loan commitment, the need for a $160,000 advance fee, and IFSG's plan to offer loans to others to raise the required amount. In March, Ruis left Radio Shack and began to work in the IFSG office, assisting Pletcher with paperwork, including the processing of advance fee loan applications. In mid-April, the directors of IFSG decided that Ruis should be appointed "Executive Director for Operations" with a salary to be set at funding.

During March and April, Ruis attended several of the meetings where the advance fee loan program was explained to prospective investors. His participation consisted of taking notes and keeping a list of investors and potential investors. At one meeting in Adrian, Minnesota, Pletcher asked Ruis to discuss the loan program with a prospective investor and his wife, who were divided on the issue of whether to participate. When the wife continued to express reservations, Ruis advised the couple not to invest. At that point, the local sheriff and a county attorney, both of whom had attended the meeting, seized some of the loan applications and related documents being handed out by Pletcher, and left the room followed by Pletcher and Ruis. While Pletcher was talking to the county attorney, Ruis returned to the meeting and led a prayer asking that Pletcher be given wisdom in dealing with any problems.

---

**4.** We have learned that, after eluding authorities for nearly two years, Thirion was recently apprehended in Europe, and has been returned to South Dakota to stand trial on the fraud and conspiracy charges.

**5.** The indictment, which contained 22 counts, also named five other individuals not presently before this court. All nine defendants were charged in all counts. Three of the counts were dismissed during the course of the trial.

**6.** Ruis moved for judgment of acquittal at the close of the Government's case, at the close of all the evidence, and again at the time of sentencing.

During the period of time that Ruis assisted Pletcher, he received a total of $1,750.[7] He never met Thirion and apparently did not participate in any of the substantive decisionmaking of IFSG. Although he was made a signatory on the IFSG checking account and was referred to in several documents as a vice president of IFSG, Ruis never wrote any checks on the account, nor did he ever function as a vice president of the corporation. Pletcher characterized Ruis' participation in the operation as "clerical." Few of the Government witnesses could identify Ruis or recognized his name. On this evidence, the jury convicted Ruis on the conspiracy count, six counts of mail fraud, and one count of inducing interstate travel to defraud.

In reviewing challenges to the sufficiency of the evidence, we must view the evidence in the light most favorable to the Government and sustain the verdict if it is supported by substantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Coronel-Quintana*, 752 F.2d 1284, 1292 (8th Cir.1985). The Government is, moreover, entitled to the benefit of all inferences that may reasonably be drawn from the evidence. *See, e.g., United States v. Henderson*, 770 F.2d 724, 729 (8th Cir. 1985); *United States v. Netz*, 758 F.2d 1308, 1310 (8th Cir.1985); *United States v. Richmond*, 700 F.2d 1183, 1189 (8th Cir. 1983).

■ After carefully reviewing the record, we must agree with Ruis that the evidence, even when viewed in the light most favorable to the Government, is not sufficient to support the jury's verdict. Essential to Ruis' conviction on the substantive fraud counts is a showing that he acted with an intent to defraud. *See, e.g., United States v. Bassler*, 651 F.2d 600, 604 (8th Cir.1981), *cert. denied*, 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 305 (1982) (intent an essential element of mail fraud); *United*

*States v. Edwards*, 516 F.2d 913 (8th Cir. 1975) (intent an essential element of the offense of inducing interstate travel to defraud). In our estimation, the Government failed to adduce evidence sufficient to establish that Ruis acted with the requisite criminal intent. The record contains no evidence that he was a knowing participant in a fraudulent scheme. He did not partake in the development of the advance fee program and made no decisions relating to its administration. Nor was the level of his participation in IFSG's affairs substantial enough that an intent to defraud can be inferred from the facts surrounding his actions. *See United States v. Wrehe*, 628 F.2d 1079, 1082–85 (8th Cir.1980).

■ Similarly, the evidence does not support Ruis' conviction on the conspiracy count. To prove that Ruis participated in a conspiratorial agreement, the Government must show that he knowingly contributed his efforts in furtherance of the illegal objective of the conspiracy. *United States v. American Grain & Related Industries*, 763 F.2d 312, 315 (8th Cir.1985). Mere knowledge of the existence of a conspiracy or mere association with individuals engaged in illegal conduct is not enough. *United States v. Richmond*, 700 F.2d at 1190. The Government must demonstrate " 'some element of affirmative cooperation or at least an agreement to cooperate' in the objective of a conspiracy." *Id.* (quoting *United States v. Brown*, 584 F.2d 252, 262 (8th Cir.1978), *cert. denied*, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979)). The evidence of Ruis' activities falls short of demonstrating the knowing, affirmative cooperation necessary to sustain a conviction for conspiracy. *See Richmond*, 700 F.2d at 1190–91. *Cf. Wrehe*, 628 F.2d at 1084–85 (no evidence of actual involvement in or agreement to illegal object of conspiracy). Accordingly, Ruis is entitled to a judgment of acquittal on all counts.

---

**7.** Ruis received $250 a week for five weeks, and was repaid $500 he had previously advanced to

Pletcher to pay a phone bill.

## B. Jury Instructions.

■ Casperson, Pletcher, and Sablosky [8] contend that the district court erred in refusing to give requested good faith and theory of defense instructions. We agree.

The essence of the charges against the appellants was that they defrauded investors by making representations about the loans and loan guarantees which they knew to be untrue, or which were made with an intent to deceive or with reckless indifference as to their truth or falsity. In response, appellants requested a good faith instruction identical to one approved in *United States v. Ammons*, 464 F.2d 414, 417 (8th Cir.), *cert. denied*, 409 U.S. 988, 93 S.Ct. 343, 34 L.Ed.2d 253 (1972). That instruction explains, *inter alia*, that good faith constitutes a complete defense to charges requiring fraudulent intent. The trial judge refused to give the *Ammons* instruction, indicating that he found it difficult to understand and not "well done." He stated, however, that he would try to come up with a good faith instruction that was accurate, intelligible, and consistent with the other instructions. When the judge later proposed his own version of a good faith instruction, both the Govern-

ment and defense counsel offered objections.[9] Ultimately, the trial judge chose not to give any good faith instruction.

The trial judge also denied appellants' requests for related theory of defense instructions. Casperson and Pletcher proffered identical "position instructions," short statements of their position in response to the Government's charges against them.[10] They point out that in *Ammons*, this court approved the trial court's good faith instruction with the caveat that it "could have been enlarged to incorporate the specific factors upon which the appellant relied to show he acted in good faith * * *." 464 F.2d at 417. Pletcher and Casperson maintain that their position instruction set forth such "specific factors" and clarified the defense. They argue that the trial court's refusal to give the instruction, coupled with the failure to instruct on the specific issue of good faith, effectively removed their theory of defense from the purview of the jury. Sablosky, whose defense theory was that all his actions were consistent with his duties and obligations as an attorney, requested an instruction defining the duties of an attorney.[11] Sablosky argues that the proposed

---

**8.** We need not consider Ruis' challenge to the jury instructions in light of our conclusion that the evidence was insufficient to support his conviction.

**9.** The last sentence of the court's proposed instruction stated:

> If the evidence in the case leaves the jury with a reasonable doubt whether the defendants, or any of them, acted in bad faith, then the jury should acquit any defendant so acting.

Both sides argued that the term "bad faith" should be changed to "good faith." Although the Government had several additional objections to the instruction, the appellants requested that the court's version of the instruction be given—with the suggested change—if their own good faith instruction were refused.

**10.** Casperson and Pletcher offered the following "position instruction:"

> To the Government's charges of conspiracy, mail fraud, wire fraud and inducing interstate travel to defraud, [each defendant] responds: He believed that Dr. Thirion had secured an international loan and that the loan was forthcoming upon payment of the loan contingency cost. He further believed that repayment

of a loan contingency cost was guaranteed by the sale of the tuna fish. Finally he believed that the statements he made at the time of such loan offerings to be true. He neither schemed nor intended to defraud anyone of their money.

**11.** Sablosky's proposed instruction provided:

> When considering the charges against the defendant Ronald A. Sablosky you are instructed that an attorney has certain duties and responsibilities to his clients, such as:
> 1. To represent his client zealously within the bounds of the law (Canon 7–1);
> 2. While serving as an advocate, a lawyer should resolve in favor of his client doubts as to the bounds of the law, without knowingly assisting the client to violate the law (Canon 7–1);
> 3. Resolve reasonable doubts as to the client's state of the mind in the client's favor (Canon 7–6); and
> 4. If he discovers during the course of the representation that his client has committed a fraud, he shall promptly call upon his client to rectify the same; and, if his client refuses or is unable to do so, he shall immediately

instruction was relevant to the issue of specific intent, and that without it, the jury was unable to consider his defense of good faith legal representation.

As noted earlier, fraudulent intent is an essential element of the crimes for which appellants were convicted. Good faith constitutes a complete defense to such specific intent crimes. *See, e.g., United States v. Sherer*, 653 F.2d 334, 337 (8th Cir.), *cert. denied*, 454 U.S. 1034, 102 S.Ct. 573, 70 L.Ed.2d 478 (1981); *United States v. Ammons*, 464 F.2d at 417. It is well-established that defendants are entitled to a theory of defense instruction if a timely request is made, the evidence supports the proffered instruction, and the instruction correctly states the law. *See, e.g., United States v. McQuarry*, 726 F.2d 401, 402 (8th Cir.1984); *United States v. Lewis*, 718 F.2d 883, 885 (8th Cir.1983). Similarly, this court has held that defendants are entitled to an instruction on good faith where one has been requested and evidence exists to support the theory. *See Sherer*, 653 F.2d at 337. *Accord United States v. Hopkins*, 744 F.2d 716, 717 (10th Cir.1984) (en banc); *United States v. Fowler*, 735 F.2d 823, 828 (5th Cir.1984); *United States v. Goss*, 650 F.2d 1336, 1345 (5th Cir.1981). It is, of course, equally well-established that defendants are not entitled to a particularly worded instruction when the instructions actually given by the trial court adequately and correctly cover the substance of the requested instruction. *See, e.g., United States v. Reda*, 765 F.2d 715, 719 (8th Cir. 1985); *United States v. Lisko*, 747 F.2d 1234, 1238 (8th Cir.1984). Moreover, this court evaluates the adequacy of a trial court's instructions by considering them as a whole. *See, e.g., McQuarry*, 726 F.2d at 402; *Lewis*, 718 F.2d at 885.

In the present case, appellants timely submitted proposed good faith and theory of defense instructions. The *Ammons* instruction they proffered has previously been approved by this court and is an acceptable statement of the applicable law. Casperson, Pletcher, and Sablosky all offered evidence in support of the good faith claim. Indeed, they did not really dispute Government evidence concerning what they said and did. The entire defense in this case was that the alleged false statements and representations were made with a genuine belief that they were true, and that Thirion could do what he said he would do. However a fact finder might evaluate the strength and credibility of that evidence,[12] appellants were entitled in the circumstances to have the jury specifically instructed on their good faith theory of defense.

The trial judge did charge the jury that a finding of specific intent to defraud is required for conviction. The Government urges us to find that this instruction—along with other instructions defining certain terms used in the indictment such as "wilful" and "specific intent"—was sufficient to cover the substance of the good faith defense. However, on reviewing the charge as a whole, we cannot agree that the instructions directed the jury's attention to the defense of good faith with sufficient specificity to avoid error. *See Goss*, 650 F.2d at 1345. *See also Hopkins*, 744 F.2d at 718 (separate good faith instruction necessary). Nor do we believe that the error was harmless in the context of this case. The trial was long and complex, involving not only five defendants, but numerous charges, witnesses, and exhibits. The evidence of guilt was not overwhelming. In fact, the jury deliberated for a full five days before returning verdicts, sug-

---

withdraw from representation of the client (Canon 7–2, DR 7–102(B)).

You should consider the above duties and responsibilities of the defendant Ronald A. Sablosky to his clients, along with all the other evidence in this case, when considering his actions and intent, and, if this evidence leaves you with a reasonable doubt, then the jury should acquit the defendant.

**12.** Where, as here, the defense theory provides a legal defense to the charge against the defendants, they are entitled to a theory of defense instruction even if the evidence supporting the claim is weak, inconsistent, or of doubtful credibility. *United States v. Prieskorn*, 658 F.2d 631, 636 (8th Cir.1981); *United States v. Goss*, 650 F.2d at 1345.

gesting that the case was a very close one. In the circumstances, we cannot say that the trial court's failure to draw the jury's attention to appellants' theory of defense was harmless beyond a reasonable doubt. Accordingly, we are compelled to reverse and remand for a new trial.

At the new trial, it will, of course, be within the discretion of the trial court to decide the precise form the instruction or instructions will take on appellants' good faith theory of defense. We hold only that the appellants are entitled to adequate and appropriate instructions on the substance of that defense if such instructions are again properly requested and supported by the evidence.[13]

### C. Other Claims.

Because the issue may again be raised on retrial, we note that the contention of Casperson and Pletcher that the doctrine of merger bars their conviction on both the substantive and conspiracy counts is without merit. Where sufficient evidence is adduced to support a finding that a conspiracy existed and that a defendant was part of that conspiracy, a jury may find the defendant guilty not only of a conspiracy, but of a substantive crime committed by his co-conspirators in furtherance of the conspiracy, even though he does not participate in the commission of the substantive offense. *See, e.g., Pinkerton v. United States,* 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); *United States v. Richmond,* 700 F.2d at 1191. *See also United States v. Nims,* 524 F.2d 123, 126 (5th Cir.1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976) (conspiracy does not merge with substantive offenses even if defendants are alleged to have aided and abetted one another in the commission of a substantive offense).

In view of our disposition of the jury instruction issue, we need not address Sa-

blosky's claim that the trial court erred in denying his motion for a continuance.

For the foregoing reasons, we vacate the conviction of Gerald Ruis and remand to the district court with instructions to enter a judgment of acquittal. The convictions of Jack Casperson, Phil Pletcher, and Ronald Sablosky are reversed and remanded for a new trial.

Let our mandate issue forthwith.

---

**13.** In our view, the trial court did not err in refusing to submit Sablosky's instruction on an attorney's duties and responsibilities to his clients in the precise language proposed by Sa-

blosky. However, some instruction on his defense of good faith legal representation may well be appropriate. *See United States v. Mardian,* 546 F.2d 973, 981–82 (D.C.Cir.1976).