**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Anthony LOSCALZO, Andrew Loscalzo, Merry Stumpf, David H. Siegel, and Albert L. Boemo, Defendants–Appellants.**

Nos. 92–3323, 92–3324, 92–3325, 92–3350, and 92–3351.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 4, 1993.

Decided Feb. 24, 1994.

---

Frances C. Hulin, U.S. Atty. (argued), Danville, IL, for plaintiff-appellee.

Greg Chickris (argued), Phares & Chickris, East Moline, IL, for Anthony Loscalzo

Raymond D. Perry (argued), Davenport, IA, for Andrew Loscalzo.

Mary E. Gentile (argued), Chicago, IL, for Merry Stumpf.

William G. Schick, Rock Island, IL, for David H. Siegel.

David Siegel, pro se.

Douglas C. Scovil (argued), Ruud, Scovil & Neppl, Rock Island, IL, for Albert L. Boemo.

Before BAUER, and RIPPLE, Circuit Judges, and REYNOLDS, District Judge.*

BAUER, Circuit Judge.

Anthony Loscalzo, Andrew Loscalzo, Merry Stumpf, David Siegel, and Albert Boemo were convicted of conspiracy to defraud the United States and several counts of mail fraud. Their convictions stem from fraudulent representations made in connection with obtaining a contract procured by the United States Postal Service ("Postal Service"). They each appeal various aspects of their convictions and sentences. We affirm.

## I.

As a matter of general policy, the Postal Service encourages minority entrepreneurship. To promote this policy, the Postal Service will, on occasion, solicit bids for spec-

---

* The Honorable John W. Reynolds, United States District Judge for the Eastern District of Wisconsin, is sitting by designation.

ified goods or services from minority enterprises only. A minority enterprise is a business "of which at least 51 percent is owned by and of which the management and daily business operations are controlled by one or more members of a minority group." U.S. Postal Service, Form No. 7319–C, Representations and Certifications (April 1983). In the early part of 1986, the Postal Service decided to purchase a large quantity of shoring beams. Shoring beams are metal bars which secure mail-carrying containers to one another inside mail trucks. After determining that the shoring beam order would be a suitable contract for minority businesses, the Postal Service solicited bids from eligible organizations.

The Postal Service received bids from Martinez Manufacturing, Solis Industries, and Hartec Enterprises. Although Hartec's bid was the lowest, its bid was deemed unacceptable when it tried to renegotiate the terms of the contract. On August 4, 1986, the Postal Service awarded Solis Industries, now known as Soltech, the shoring beam contract. The terms of the contract called for the delivery of 17,992 shoring beams at the bid price of $46 per unit with the Postal Service retaining an option to purchase another 25%.

Questions about Martinez Manufacturing's and Soltech's classifications as minority enterprises sparked an investigation and subsequently gave rise to prosecution of this case. These are the stories that unfolded.

Plans to establish Martinez Manufacturing began in the Quad Cities region of Western Illinois and Eastern Iowa in the fall of 1984 when Anthony Loscalzo and his son Andrew approached Anthony Martinez, a Hispanic man, about the possibility of setting up a minority business with Martinez as president. Having been laid off from his job as a forklift operator, Martinez was understandably interested in becoming president of a company. In January of 1985, after some additional meetings, David Siegel filed Articles of Incorporation for Martinez Manufacturing with the Illinois Secretary of State. The Articles listed Martinez and Andrew Loscalzo as the directors, Martinez and Anthony Loscalzo's daughter, Merry Stumpf as

the officers, and Siegel as the registered agent. Siegel's residence in Moline, Illinois was given as the corporation's registered place of business.

Martinez's involvement in the venture was minimal and short-lived. He met with the Loscalzos, Siegel, and Albert Boemo prior to opening a checking account for the corporation, in February of 1985, and later travelled with Siegel to Chicago to meet with representatives of the Small Business Administration for purposes of discussing the corporation's minority status. For a long while after returning from that trip, Martinez did not hear from the Loscalzos, Siegel, or Boemo. When he asked Anthony Loscalzo about the company's operations, Anthony replied that they were waiting to hear from the government for confirmation of the corporation's minority status. Then, in October of 1985, Anthony instructed Martinez to make out a check to Siegel closing out the corporate account. After doing as instructed, Martinez heard no more from the Loscalzos, Siegel or Boemo and understood this to mean that the business was defunct.

Contrary to Martinez's belief, the corporation remained active. Stumpf and Siegel filed annual reports on its behalf for the years 1986 through 1988 with the state. All of those reports listed Martinez as the corporation's president, and one report contained what purported to be his signature. The company also tendered a bid on the shoring beam contract. Siegel received and handled all correspondence pertaining to the company's bid.

While setting up Martinez Manufacturing, the Loscalzos and Siegel discussed plans for another minority corporation with a Hispanic acquaintance by the name of Steve Solis. These discussions led to the formation of Solis Industries, incorporated in Illinois in May of 1985. As the corporation's sole shareholder, Andrew named as directors Boemo, Stumpf and Richard Strum, who was one of Anthony's business partners. The directors proceeded to elect Solis, Andrew, and Stumpf as the corporation's President, Vice–President, and Secretary–Treasurer respectively. Solis was never asked to invest

in the corporation and was never made a shareholder.

In the latter part of 1985, Solis Industries began preparing its bid on the shoring beam contract. As part of its preparation, Solis Industries rented space for its operations in a vacant Moline building. Not coincidentally, the property was owned by BLS Partnership, an association composed of Boemo, the Loscalzos, and R & R Marketing, an entity owned by Richard Strum and his wife Rhoda. On March 5, 1986, two days before Solis Industries submitted its bid on the Postal Service contract, Andrew transferred fifty-five of his 100 shares to Glen Phillips, a native American construction worker known to Siegel through a mutual friend. After the stock transfer, Andrew certified the corporation as a minority enterprise. Later in March, Stumpf and Andrew filed documents changing the name of Solis Industries to Soltech.

After receiving the bid, Andrew, Stumpf, and Siegel opened a checking account for Soltech with each as an authorized signatory. Through one of their corporate entities, Executive Marketing Systems ("EMS"), the Loscalzos deposited $4,500 in Soltech's account. Stumpf then assigned the shoring beam contract to the Southeast National Bank in Moline, Illinois as collateral for a $321,000 loan. As additional security for the loan, Siegel, Anthony, Boemo and EMS signed documents guaranteeing Soltech's loan. With financing in place, Soltech set out to begin production. Rather than manufacturing the beams themselves, Soltech decided it would subcontract out to a nonminority company, McLaughlin Body Company, to produce the entire quantity of shoring beams for $33.60 per unit.

Meanwhile, on September 2, 1986, the directors of Soltech fired Solis as president and replaced him with Phillips. Solis testified that he had insisted on being more involved in the company's decision making and that his firing was motivated by the directors' reluctance to allow him to participate. Solis had been led to believe that Soltech had been unsuccessful in obtaining any contracts. When he came across a business card from a man claiming to represent Solis Industries,

he realized that his company was in fact active and Solis requested that Andrew keep him abreast of operations. Solis's demands were met with some resistance and when he attempted to enter Soltech's premises to see for himself, he discovered that the locks had been changed. Solis's subsequent inquiries also proved fruitless and he never heard from anyone at Soltech again.

While employed as president of Solis Industries, Steve Solis never received any salary, corporate stock or compensation of any kind. Though told that he was brought on board for his business knowledge and his specific expertise in purchasing, Solis testified that he was not asked to assist in preparing the shoring beam contract and had no input in the decision to lease property from BLS. He was not consulted about the decision to change the corporate name nor was he informed about the transfer of corporate stock to Phillips. When Soltech received the shoring beam bid, Solis was not notified and he was not involved in obtaining financing or in arranging the subcontract. Phillips duties as president were similarly nonexistent. He had no role in running the day-to-day operations of the corporation and participated in no decisions relating to the Postal Service contract. In fact, while president, Phillips continued to report to work at his construction job.

On May 8, 1991, the grand jury returned an indictment charging the defendants with one count of conspiracy to defraud the United States and thirty-one counts of mail fraud. The indictment alleged that the defendants conspired to impair and obstruct the Postal Service in its awarding of minority enterprise contracts by establishing corporations with a nonparticipating minority person listed as a figurehead president.

Upon the jury verdict finding all the defendants guilty of conspiracy and mail fraud, the court entered judgment and sentenced each defendant to various terms of imprisonment and supervised release. Anthony Loscalzo was sentenced to thirty-seven months imprisonment and two years of supervised release. Andrew Loscalzo was sentenced to twenty-seven months imprisonment, three years of supervised release and ordered to pay $7,200

in restitution, pursuant to the Victim and Witness Protection Act. 18 U.S.C. §§ 3663, 3664. The court sentenced David Siegel to twelve months imprisonment, two years of supervised release and ordered him to pay $88,140.40 in restitution. Albert Boemo was sentenced to five months imprisonment, two years supervised release and ordered to pay $58,700. Merry Stumpf received a sentence of four months imprisonment, three years supervised release, and was ordered to pay restitution in the amount of $5,000.

## II.

On appeal, the Loscalzos, Stumpf, Siegel, and Boemo raise several claims, both jointly and individually. None of these claims merits reversal.

### A. Sufficiency of the Evidence

■ The Loscalzos, Stumpf, Siegel, and Boemo each challenge the sufficiency of the evidence supporting the verdicts in this case. Their burden is formidable. They must demonstrate that based on the evidence viewed in a light most favorable to the government, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Tylkowski,* 9 F.3d 1255, 1259 (7th Cir.1993). We may overturn a jury verdict only "when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Moore,* 764 F.2d 476, 478 (7th Cir.1985) (citations omitted).

■ All of the defendants contend that the government offered no evidence tending to prove that they had the requisite intent to participate in a conspiracy to defraud the United States. They insist that the evidence adduced at trial supports only a finding that their actions were completely consistent with the Postal Service's definition of a minority business. We find, however, that there was substantial evidence supporting a finding that the defendants never intended for the operations of either Martinez Manufacturing or Soltech to be controlled by members of a minority group.

Evidence provided by Anthony Martinez and Steve Solis was especially probative of the intent element. Martinez never invested anything in the corporation and received no compensation. Nor was he ever involved in any of the decisions related to getting the corporation started. When he inquired about the company's activities, he was not told of anything. Though his connection to the company had ceased long before the Postal Service received a bid on the shoring beam contract from Martinez Manufacturing, corporate records continued to list him as president for years thereafter. At least one of those documents contained a forgery of Martinez's signature.

Steve Solis's testimony painted a similar picture of the events which took place at Soltech. Solis was never asked to invest in the corporation and he also received no compensation. Solis was told that he was brought on board for his expertise in purchasing, yet he was not asked to assist in preparing the shoring beam bid and he was not involved in decisions pertaining to the company's operations after Soltech was awarded the contract. Though he knew that Soltech was bidding on the contract, Solis thought that the contract had been awarded to another company and was not informed otherwise. Like Martinez, Solis made futile attempts to involve himself in the business.

From this evidence, the jury could have reasonably concluded that Martinez's and Solis's presidencies were never intended to be anything but decorative, done solely for the benefit of deceiving representatives of the Postal Service and the Small Business Administration. Both companies were, in reality, nonminority businesses designed to take advantage of the premium prices which the government was willing to pay to promote minority entrepreneurship. If the testimonies of Martinez and Solis were not enough, Richard Strum's testimony as to a remark made by Anthony Loscalzo surely put to rest any doubts about his intent in establishing these corporations. When it became evident that Solis was not willing to be a figurehead president, Strum asked Anthony what they were going to do. Anthony

replied, "[I]f we have to, we'll use the shoe shine man in the Blackhawk [lounge]."

Albert Boemo and Merry Stumpf offer alternative challenges. Each argues that even if the two corporations were involved in fraudulent activity, their own respective roles were insignificant and, therefore, the evidence supporting their convictions was insufficient to prove beyond a reasonable doubt that they had the requisite specific intent to commit the crimes. We note as a preliminary matter that the government offered, in addition to the substantive conspiracy theory, an aiding and abetting theory. This permitted the jury to convict the defendants of conspiracy if they found either that the defendants were parties to the original agreement and committed an overt act in furtherance of the conspiracy or, alternatively, that the defendants performed some act which they knew would further the conspiracy. The evidence need only have supported one of the two theories.

█ Boemo characterizes his role as that of an ignorant partner, claiming that he was unaware Soltech was engaging in fraud of any kind. Evidence that he benefitted financially from the arrangements, that he personally guaranteed Soltech's debt, and that he acted as a Soltech director suggests a degree of responsibility which supports the verdict. As director of Soltech, Boemo was involved in decisions which required a significant level of knowledge. One such decision was the decision to fire Solis, a man with considerable business experience and a willingness to participate, and to replace him with Phillips, a construction worker. Having had an opportunity to view Solis and Phillips at trial, the jury could reasonably have concluded from this action that the directors of Soltech were looking for a figurehead minority president who would stay out of the way.

█ Stumpf claims that her duties were purely clerical and her participation in any conspiracy could not be "knowing and affirmative." In support of her argument, Stumpf cites *United States v. Casperson*, 773 F.2d 216 (8th Cir.1985), in which the Eighth Circuit overturned on sufficiency grounds, the conviction of a coconspirator charged in connection with a fraudulent investment scheme. The defendant's responsibilities in *Casperson* were limited to taking notes at meetings and keeping track of potential investors. *Id.* at 220. He made no decisions and on at least one occasion, his conduct had been completely inconsistent with the aims of the scheme. Because the defendant's role in the scheme did not rise to the level of knowing and affirmative participation, the conviction was overturned.

Unlike the defendant in *Casperson,* Merry Stumpf's involvement in Martinez Manufacturing and Soltech was substantial. In her capacity as the only true officer of Martinez Manufacturing, she filed annual reports with the state. All of these reports, filed after Martinez's participation had ceased, affirmed that Martinez was president of the corporation and one of these reports contained what purported to be Martinez's signature. Having determined that Martinez Manufacturing's status as a minority business was the product of fraud, the jury could plausibly have found that Stumpf's actions were designed to deliberately conceal the fact that no minority person was involved with Martinez Manufacturing.

Stumpf's participation in the affairs of Soltech were also more substantial than that of the defendant in *Casperson.* Not only was she a director of Soltech and thus responsible for replacing Solis with Phillips but she was also responsible for arranging financing for Soltech after it was awarded the contract. Stumpf's duties were not of the sort normally entrusted to a clerical employee. The evidence suggests a level of knowledge and responsibility consistent with the jury's finding.

Our review of the record leads us to conclude that there was substantial evidence supporting the jury's finding that Martinez Manufacturing's and Soltech's minority classifications were the product of fraudulent actions on the part of the defendant. The evidence also supports the jury's conclusion that Albert Boemo and Merry Stumpf were knowing participants in the scheme.

### B. Jury Instructions

Stumpf alleges that the trial court made three errors in charging the jury. Our re-

view of the record assures us, however, that the trial judge's instructions were intelligible and faithful to the law.

■ In evaluating the merit of challenged jury instructions to which objections were properly raised in the proceedings below, we review the charge in its entirety and ascertain whether the jury was misled in any way and whether it had an understanding of the issues and its duty to determine those issues. *United States v. Boykins*, 9 F.3d 1278, 1285 (7th Cir.1993). If the instructions are adequately supported by the record and are fair and accurate summaries of the law, the instructions will not be disturbed on appeal. *Id.*

First, Stumpf argues that the trial court's instruction on aiding and abetting[1] created confusion of constitutional dimension. Far from lucid, Stumpf's contention appears to be that an instruction on aiding and abetting, in addition to the instructions on the elements of conspiracy, misled the jury into believing that Stumpf could be convicted of conspiracy without a finding that she was a knowing party to the agreement. She adds that the confusion was enhanced because aiding and abetting was not charged in the indictment.

■ Aiding and abetting is not a separate crime. An aider or abettor of a substantive offense may be treated as a principal. 18 U.S.C. § 2. Since conspiracy is a substantive offense, a defendant may be found to have aided or abetted a conspiracy. *United States v. Galiffa*, 734 F.2d 306 (7th Cir.1984).

■ Stumpf's argument recognizes the distinction between aiding and abetting a conspiracy and participating in a conspiracy, but she contends that this distinction is somehow improper. We disagree. The aiding and abetting statute serves to complement the substantive offense of conspiracy. Recognizing that conspirators often employ assistants in carrying out their plans, the statute enables the government to prosecute those who have knowingly furthered the aims of the conspiracy but who were not members of the conspiracy. The charge of aiding and abetting does not exempt the government from proving the defendant had the requisite criminal intent because the jury must still find that the aider or abettor knowingly acted to make the venture succeed.

■ Taken as a whole, the charge informed the jury that there were two alternate means of finding Stumpf guilty of the substantive offense and that they had to consider both. The government was not required to charge Stumpf with aiding and abetting in the indictment. Aiding and abetting need not be specifically pleaded, and an aider or abettor still may be convicted of the substantive offense as long as no unfair surprise exists. *United States v. Tucker*, 552 F.2d 202, 204 (7th Cir.1977). Stumpf does not claim that any unfair surprise was created here, and we, therefore, do not reach that issue.

■ Stumpf's second challenge to the charge need not detain us long. Upon delivering an instruction concerning participation in a conspiracy, the trial judge noticed that the instruction was erroneous. The original instruction permitted the jury to consider only the defendant's acts and statements in determining membership in the conspiracy. In fact, while only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of coconspirators. The trial judge brought the mistake to the attention of the jury and corrected the instruction. Stumpf argues that the court's handling of this matter was confusing and merits reversal.

We note as an initial matter that the court's correction was an accurate statement of the law. *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir.1990), *cert. denied*, 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). Contrary to Stumpf's contention, we

---

1. Instruction # 11 reads as follows:
 Any person who knowingly aids, abets, counsels, commands, induces or procures the commission of a crime is guilty of that crime.

However, that person must knowingly associate himself or herself with the criminal venture, participate in it, and try to make it work.

**384**

cannot envision a better way for a trial judge to handle the situation than the judge did in this case. Upon discovering the error, he brought it to the attention of counsel. He then described to the jury what portion of the instruction was wrong and asked them to disregard that portion. Finally, he went on to give the instruction as corrected. Though the instruction process was interrupted, the court's actions served to clarify the law rather than confuse or mislead the jury.

Stumpf's third and final argument concerning the jury instructions is that the court's failure to tender an instruction on her good faith defense was plain error under Rule 52(b) of the Federal Rules of Criminal Procedure. The plain error standard is appropriate here because Stumpf did not request this instruction at trial. *United States v. Requarth,* 847 F.2d 1249, 1254 (7th Cir. 1988). Reversal is appropriate under this standard only if the error had a probable impact on the jury's verdict. *United States v. Jackson,* 569 F.2d 1003, 1010 (7th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978). If the essential elements of the unrequested instruction were covered elsewhere in the charge, the plain error standard is not met. *United States v. Kehm,* 799 F.2d 354, 363 (7th Cir.1986).

The trial court instructed the jury that if they found that Boemo, Stumpf, and the Loscalzos established and operated the two corporations because they each honestly believed, based on Siegel's advice, that what they were doing was legal, then the jury would have to acquit each of them. Stumpf argues that the trial court was obligated to provide a separate instruction advising the jury that they could acquit any defendant whose actions were in good faith irrespective of Siegel's advice.

Even if the court's failure to give a separate good-faith instruction was error, it does not rise to the level of plain error and does not warrant reversal. In addition to the "advice of attorney" instruction, the court's instructions to the jury describing the elements of aiding and abetting as well as the substantive offenses provided a sufficient amount of guidance about the level of intent and knowledge which had to be proven be-

fore Stumpf could be convicted. The jury did not need a separate instruction to understand that if they found that Stumpf had acted honestly, she could not be found guilty. The government offered enough evidence to convict her and the court provided enough guidance on how to evaluate that evidence.

## C. Effective Assistance of Counsel

Andrew Loscalzo claims that errors made by his trial counsel were sufficiently egregious to constitute constitutionally ineffective representation under the Sixth Amendment. Specifically, he alleges his attorney failed to present evidence showing that: (1) Solis was unable to invest in Solis Industries; (2) the two enterprises were in fact minority businesses or at least showing his belief that the enterprises were in fact minority businesses; (3) the Postal Service did not lose money on the Soltech contract; and (4) Solis was fired because he failed to perform his duties satisfactorily.

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. U.S. Const. amend VI. To prevail on such a claim, the defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) that but for the deficiencies, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984); *Coogan v. McCaughtry,* 958 F.2d 793, 798 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 495, 121 L.Ed.2d 433 (1992). The difficulties and biases inherent in such an after-the-fact evaluation require that a reviewing court be highly deferential to counsel's performance, finding ineffectiveness only when the defendant can overcome the presumption that the challenged action or inaction could not fall within the broad range of sound trial strategy. *Cuppett v. Duckworth,* 8 F.3d 1132, 1135–36 (7th Cir.1993).

Having set out the standard of review, we turn to Andrew Loscalzo's claims. He contends first that his counsel should have cross-examined Solis or called a witness to testify that Solis lacked the finances to

invest in Solis Industries. This evidence, Andrew concludes, would rebut Solis's testimony that the defendants never asked him to become a shareholder. Andrew overlooks the fact that Solis was in fact cross-examined on this point and insisted that he had the necessary funds. As for calling a witness to impeach Solis, the decision not to call a witness is a tactical choice which is not subject to review. *Cartee v. Nix,* 803 F.2d 296, 303 (7th Cir.1986), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1584, 94 L.Ed.2d 774 (1987).

Andrew's next claim is that his attorney should have called witnesses to testify that both Soltech and Martinez Manufacturing met the Postal Service definition of a minority enterprise. Alternatively, he argues that at the very least his counsel should have offered evidence that he was acting on the advice of his attorney, David Siegel. We reject both arguments. The decision not to call witnesses is not reviewable as we have explained. Were it reviewable, we would still find the decision defensible given that the trial judge had consistently prohibited testimony as to whether or not the businesses at issue satisfied the Postal Service definition of a minority business (an appropriate prohibition, since testimony on this issue would amount to a purely legal conclusion and thus be unhelpful or misleading to the jury). Andrew's alternative claim overlooks the fact that David Siegel testified that at the time the corporations bid on the contract, he believed the corporations were eligible. The court instructed the jury that if they found that Andrew had acted in good faith based on Siegel's advice, they should acquit him. As they were entitled to do, the jury rejected this version of events, but not because of any incompetence on the part of Andrew Loscalzo's attorney.

▮ Andrew claims that he had evidence that the Postal Service had paid $57 per unit on prior shoring beam contracts. After a postal service employee testified that in ordinary open market bidding, the Postal Service could have had the work done for $30 per unit, Andrew urged his attorney to impeach the employee with this evidence. The attorney did not cross-examine on this point, and Andrew argues that this was the third in-

stance of ineffective representation. Since the Soltech contract charged the Postal Service $46 per unit, and because his sentence and restitution award were both based on the loss suffered by the Postal Service, Andrew predicts that this evidence would at the very least have reduced his punishment.

Even if this claim met the first prong of *Strickland,* Andrew fails to demonstrate the necessary prejudice. This is because the court did not rely on the free market figure in calculating the loss. The court decided that the free market price was irrelevant because the Postal Service was prepared to pay a higher than market price in order to promote its minority business policy. Instead, the court used what it believed was a reasonable estimate of the market price in a minority market and subtracted this from the Soltech bid to arrive at the loss figure.

▮ Finally, Andrew contends that his attorney should have cross-examined Solis regarding his departure from Soltech. He claims that had his trial counsel done so, the jury would have found that Solis's firing was the product of Solis's own failures. This claim also lacks merit. The decision not to press Solis on his departure was completely reasonable given his direct testimony, in which he insisted that he was prevented from ever participating in the affairs of Soltech. There was no reason to believe that Solis would have retreated from his position, and, therefore, cross-examination on this issue may have served only to emphasize Solis's version of events. The decision not to cross-examine was even more defensible given that the defendants submitted corporate documents stating that Solis was fired because he failed to fulfill his duties as president. We conclude, for all of the foregoing, that Andrew Loscalzo's representation was more than adequate by constitutional standards.

### D. Sentencing

The Loscalzos, Stumpf, Siegel, and Boemo each challenge various aspects of their sentences. First, they contend that the court's calculation of the pecuniary loss suffered by the Postal Service was clearly erroneous. Second, Boemo and Siegel claim that the court's decision ordering them to pay restitu-

tion was an abuse of discretion. Third and lastly, the Loscalzos, Siegel, and Boemo argue that the court abused its discretion in determining for sentencing purposes, the roles played by each. We consider each argument in turn.

*1. Calculation of Loss.* The government must establish the amount of loss sustained by the victim of the criminal activity by a preponderance of the evidence. 18 U.S.C. § 3664(d). After considering four different measures of loss submitted by the government, the trial judge decided that the fairest measure was that which subtracted the amount which the Postal Service would have paid a true minority corporation from the amount paid to Soltech. Using Hartec's bid as an estimate of what the Postal Service would have paid to a true minority firm, the court determined that the total loss was $293,828. Because the loss was between $200,000 and $350,000, the court increased the base offense level of the defendants under the Sentencing Guidelines by seven points. U.S.S.G. § 2F1.1(b)(1).

■■■ Boemo, Siegel, Stumpf, and the Loscalzos dispute the fact that there was any loss at all, and they argue that the trial court assumed without specifically finding that the Postal Service suffered a loss. Alternatively, they argue that the loss should have been limited to Soltech's profits. *United States v. Schneider,* 930 F.2d 555 (7th Cir.1991). The district court's determination of loss under § 2F1.1(b)(1) of the Sentencing Guidelines is a finding of fact reviewable for clear error only. *United States v. Strozier,* 981 F.2d 281, 283 (7th Cir.1992). The definition of "loss" is a legal question subject to de novo review. *United States v. Holiusa,* 13 F.3d 1043, 1045 (7th Cir.1994).

■■■ Our review of the record reveals that the trial judge specifically found that the Postal Service paid a premium price to Soltech for the purpose of furthering the policy of increased minority entrepreneurship. Awarding the contract to Soltech did not advance that aim, and, therefore, the Postal Service was fraudulently induced into paying for something which it did not receive. This finding was supported by ample evidence and does not merit reversal.

■■■ As for the court's calculation of loss, we held in *Schneider* that where the fraud would not deprive the government of the contracted-for consideration, the difference between the contract price and the contractor's costs was a more appropriate measure of damages than the full contract price. The fraud here is of a different nature. The government did not get the full contracted-for consideration, namely, performance by a minority operation. Using the difference between a true minority bid and Soltech's bid was, therefore, a permissible measure of damages.

*2. Restitution.* At sentencing, the trial judge ordered four of the five defendants to pay restitution pursuant to the Victim and Witness Protection Act. 18 U.S.C. §§ 3663, 3664. Being completely penniless, Anthony Loscalzo was not required to pay anything. Boemo and Siegel, who were ordered to pay the most, characterize the awards as an abuse of discretion.

■■■ Trial judges enjoy broad discretion in ordering restitution. Unless the judge abuses that discretion by using improper considerations or unreliable information, an award of restitution authorized by statute will not be vacated on review. *United States v. Mahoney,* 859 F.2d 47, 49 (7th Cir.1988). In determining whether to order restitution and how much to award, the trial court must consider the following factors: (1) the amount of loss sustained by the victim as a result of the offense; (2) the financial resources of the defendant; (3) the financial needs of the defendant and his or her dependents; (4) the financial earning ability of the defendant and his or her dependents; and (5) any other factors the court deems appropriate. 18 U.S.C. § 3664(a). Congress contemplated imposition of full restitution whenever possible. 18 U.S.C. § 3663(a)(2). The defendant, therefore, bears the burden of showing by a preponderance of evidence that a restitution award is improper. *United States v. Arvanitis,* 902 F.2d 489 (7th Cir.1990).

Because the restitution awards were based on the court's determination of the Postal Service's total loss, Boemo and Siegel dedi-

cate most of their argument to challenging the underlying loss calculation. As we have already disposed of this matter, there is no need to revisit it here. The figure arrived at by the court was the product of a well-reasoned analysis based on the evidence presented at sentencing and at trial.

▮ Boemo contends, in addition, that the trial court failed to adequately consider his financial worth in making the restitution award. The record shows otherwise. Adopting the findings contained in the presentence report, the trial judge stated that although Boemo had a net worth which would enable him to pay off the entire loss amount, based on Boemo's degree of culpability, he should be responsible for only 20%. Based on these findings, Boemo's restitution was set at $58,700. One of the "other factors" which we believe is an appropriate consideration is the relative culpability of the defendant. *United States v. Anglian*, 784 F.2d 765, 768 (6th Cir.), *cert. denied*, 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986). Because nothing relied upon by the trial judge was unreliable or improper, we hold that the trial court's decision ordering Boemo and Siegel to pay restitution was not an abuse of discretion.

*3. Roles in the Offense.* Boemo, Siegel and the Loscalzos each advance various objections to the court's findings regarding their roles in the fraudulent scheme. We review the court's findings for clear error. *United States v. Spillman*, 924 F.2d 721, 723 (7th Cir.1991).

The Sentencing Guidelines instructs a court to increase the offense level of a defendant by four levels if it finds that the defendant was an organizer or leader of a criminal activity which involved five or more participants. U.S.S.G. § 3B1.1(a). The trial judge characterized his decision to adjust Anthony Loscalzo's sentence under this provision as "not a difficult one." Tr. VIII at 213. We wholeheartedly agree.

▮ Anthony Loscalzo claims that the trial court's decision was clearly erroneous because as neither a shareholder nor director of Martinez Manufacturing or Soltech, he was in no position to influence any of the corporate actions and therefore could not be considered a leader. Relevant to a court's determination of whether a particular defendant qualifies as a leader are factors such as the defendant's decisionmaking authority, the nature of participation in the commission of the offense, recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, and the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, application note 4. The fact that he was not an official organizer or leader is not dispositive. The evidence showed that Anthony Loscalzo was very active in setting up both corporations and in recruiting additional participants like Boemo and Richard Strum. Proof was also offered demonstrating that Anthony Loscalzo's marketing corporation received a sizable sum of money from Soltech and no evidence was offered showing that this money was paid as consideration for any services rendered. Finally, at sentencing the government presented evidence suggesting that Anthony Loscalzo had influenced a corrupt employee in the Postal Service procurement office to help Soltech secure the contract. In light of these facts, the trial court's sentencing decision was anything but erroneous.

Subsection (b) of Section 3B1.1 of the Sentencing Guidelines provides that a court should increase by three levels, the offense level of a defendant who can be classified as a manager or supervisor of a criminal activity involving five or more participants. Section 2F1.1(b)(2) provides that the offense level of a defendant who participated in a fraudulent scheme that involved more than minimal planning should be increased by two. The court increased Siegel's and Andrew Loscalzo's offense level pursuant to these provisions, and both contend that the adjustments constitute clear error. Siegel provides no elaboration as to why in his case the adjustment was clearly erroneous. Andrew argues that as a minority shareholder and only a vice-president, he was in no position to manage or supervise Soltech. Neither Siegel's nor Andrew's positions are persuasive.

▮ Because Siegel fails to articulate specifically the error in the trial court's anal-

ysis, we can only say that the trial judge's decision finds ample support in the record. Siegel did all the legal work for the two companies and admitted to handling correspondence relating to Martinez Manufacturing's fraudulent proposal on the shoring beam contract. More incriminating, however, was his recruitment of Phillips to be Soltech's figurehead president. This action reflected a level of knowledge and responsibility consistent with that of a person in at least a supervisory or managerial role.

 The fact that Andrew Loscalzo was a minority shareholder and vice-president in Soltech does not undermine the court's determination that he served a managerial role in the scheme. Given the evidence concerning Phillips's limited qualifications, it becomes clear that Andrew Loscalzo was not under his direction. It was Andrew who worked on the shoring beam contract and on the subsequent subcontract and who appointed Soltech's directors and officers. The trial judge's finding that Andrew Loscalzo qualified as a manager or supervisor under the Sentencing Guidelines was supported by the evidence in the record and was not erroneous. We also reject the claim by Andrew and Siegel that this fraudulent scheme did not require more than minimal planning. The duration and nature of the fraud involved here more than adequately justify the court's finding.

 Finally, Boemo challenges the court's failure to characterize his role in the venture as minimal. Defendants deemed to be minimal participants are eligible for a four level reduction whereas minor participants get only a two level downward adjustment. U.S.S.G. § 3B1.2. If the court finds that the defendant's involvement falls somewhere between minor and minimal, the guidelines permit the court to reduce the level of a defendant by three levels. Boemo was awarded this three level adjustment, and we affirm the trial court's decision. As Boemo acknowledges, a minimal participant is one who lacks knowledge and understanding of the scope and nature of the criminal activity. U.S.S.G. § 3B1.2, application note 1. The court found that although he did not participate in Soltech's day-to-day operations, Boe-

mo understood fully what he was getting into as a Soltech director and as personal guarantor of Soltech's loan. As we stated previously, the evidence supported this finding.

### E. Newly Discovered Evidence

The final claim we must decide is whether the trial court properly denied Anthony Loscalzo and David Siegel's motion for a new trial based on evidence provided by a handwriting expert after the trial which they contend proved that Richard Strum and Steve Solis had offered perjured testimony for the government. Before we analyze this claim, we will provide some additional facts.

At trial, certain corporate documents, including the BLS partnership agreement and a power of attorney document notarized by Siegel appointing Anthony Loscalzo as Strum's attorney-in-fact, were offered into evidence. These documents contained what purported to be Rhoda Strum's signature. She testified, however, that the signatures were not hers. Richard Strum testified that although he on occasion signed his wife's name to documents, he did not sign these either. Also at trial, Solis testified that he had received checks for expenses drawn on the Soltech bank account that he believed were signed by Anthony or Andrew Loscalzo.

After the trial, the court was presented with the report and affidavit of a handwriting expert. According to the report, Rhoda Strum's signature was signed by Richard Strum and the checks cashed by Solis were not signed by either of the Loscalzos. Siegel and Anthony Loscalzo claim this evidence conclusively establishes that Richard Strum and Steve Solis gave perjured testimony. They argue that the effect of Richard Strum's perjury was devastating because it was the only proven fraud in the company documents and because it destroyed the credibility of Siegel as a defense witness. Solis's alleged perjury is argued to be prejudicial because the jury was not able to consider it in determining his credibility as a witness.

 We review a decision denying a motion for a new trial based on perjured testimony under an abuse of discretion stan-

dard. *United States v. Kaufmann,* 803 F.2d 289, 291 (7th Cir.1986). A new trial should be ordered if the defendant demonstrates (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a likelihood that the false testimony affected the jury's decision. *United States v. Douglas,* 874 F.2d 1145, 1159 (7th Cir.), *cert. denied,* 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989).

 We address the Strum documents first. The trial court found that the handwriting expert's report and affidavit alone did not prove that Strum had perjured himself because it failed to exclude the possibility that his testimony was the product of mistaken recollection. At best the evidence was impeaching. We need not determine the merits of this finding because even if the evidence did in fact demonstrate perjury, Siegel and Anthony Loscalzo fail to meet their burdens under the second and third prongs of the inquiry. First, there is no proof that the government was aware of the perjury. Second, because the allegedly perjured testimony was of a cumulative nature it is not likely that the jury's verdict would have been different. For instance, the documents containing Rhoda Strum's signature were not the only example of fraudulently executed documents. The Martinez Manufacturing reports on which Anthony Martinez's name was evidently forged could have supported the same inference.

As for the checks paid to Solis for reimbursement of expenses, we believe that nothing in the handwriting expert's report established that Solis offered perjured testimony. Solis testified that he thought that the check was written by either Andrew Loscalzo or Anthony Loscalzo. Given the fact that the check was signed "A. Loscalzo", his belief was understandable. The mere fact that the analysis demonstrated the signatures to be in neither Andrew's nor Anthony's handwriting does not establish perjury on the part of Solis.

We see no error in the trial court's decision denying the defendants' motion for a new trial based on the handwriting expert's analysis. The trial court's decision is, therefore, affirmed.

### III.

For the foregoing reasons, the convictions and sentences of Anthony Loscalzo, Andrew Loscalzo, Merry Stumpf, David Siegel, and Albert Boemo are

Affirmed.